**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

DR. TAREQ KASS-HOUT,     )
   Plaintiff,       )
            )
 v.           )  CAUSE NO.: 2:20-CV-441-JPK
            )
COMMUNITY CARE NETWORK INC., *et al.*,)
   Defendants.    )

## OPINION AND ORDER

This matter is before the Court on Defendants' Motion to Dismiss Plaintiff's Complaint [DE 10], filed by Defendants Community Care Network, Inc., the Community Hospital, and Dr. Aamir Badruddin. Plaintiff Dr. Tareq Kass-Hout filed a response, and Defendants filed a reply. For the following reasons, Defendants' motion to dismiss is granted in part and denied in part.[1]

## BACKGROUND

On December 2, 2020, Plaintiff Dr. Tareq Kass-Hout filed his Complaint against Defendants Community Care Network, Inc. ("CCNI"), the Community Hospital, and Dr. Aamir Badruddin. (Compl., ECF No. 1). For purposes of the motion to dismiss, the Court considers the facts in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all plausible inferences in his favor. *Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 862 (7th Cir. 2016).

The Complaint alleges as follows: Plaintiff is an accomplished Syrian Arab endovascular neurosurgeon specialized in stroke treatment and care. *Id.* at ¶ 1. In March 2018, Plaintiff began working with Rush University Medical Center ("Rush") as an Assistant Professor in the

---

[1] The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this motion pursuant to 28 U.S.C. § 636(c).

Department of Neurosurgery, with a conjoint appointment in the Department of Neurological Services. *Id.* at ¶ 8. Pursuant to an agreement between Rush and CCNI, Plaintiff was credentialed with the Community Hospital, which is wholly owned and operated by CCNI. *Id.* at ¶ 9.

During his employment, CCNI administrator Allen Kumar required Plaintiff to work seven days per week and be on call at all times, despite not being paid for part of this time. *Id.* at ¶¶ 10, 14. Plaintiff was further required to provide certain medical care using equipment that did not conform to the proper standard of care. *Id.* at ¶¶ 23-24, 31. Plaintiff was subjected to racially motivated abuse and false accusations regarding the care he provided to patients. *Id.* at ¶¶ 19, 25-30, 33.

In April 2019, Defendant Dr. Aamir Badruddin was hired as an interventional neurologist and assigned to be Plaintiff's superior. *Id.* at ¶ 32. On or about May 31, 2019, Plaintiff's contract with Rush was terminated and he was replaced by Dr. Badruddin. *Id.* at ¶ 36. After Plaintiff's termination, Dr. Badruddin began defaming Plaintiff to other physicians within the Northwest Indiana and Chicago medical communities, as well as to specialists in Wisconsin and Houston, Texas. *Id.* at ¶¶ 37-38. As a result of Defendants' actions, Plaintiff's reputation in the medical community has suffered, former colleagues have distanced himself from him, he has lost 2/3 of his salary, has suffered a significant reduction in hours, has been forced to take *locum tenens*[2] work, and has suffered significant emotional distress. *Id.* at ¶¶ 39-40.

Plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission (EEOC) on January 31, 2020. *Id.* at ¶ 41. Plaintiff received a Notice of Right to Sue letter from the EEOC on September 28, 2020. *Id.* at ¶ 42.

---

[2] "Locum tenens are physicians hired on a temporary, as-needed basis." *Hussain v. Ascension Sacred Heart -- St. Mary's Hosp., Inc.*, No. 18-CV-529-WMC, 2019 WL 5310677, at *1 (W.D. Wis. Oct. 21, 2019).

2

## STANDARD OF REVIEW

"The party invoking federal jurisdiction bears the burden of establishing [that jurisdiction exists]." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "Under [Federal Rule of Civil Procedure] 12(b)(1), 'the district court must accept as true all material allegations of the complaint, drawing all reasonable inferences therefrom in the plaintiff's favor, unless standing is challenged as a factual matter.'" *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 691 (7th Cir. 2015) (quoting *Reid L. v. Ill. State Bd. of Educ.*, 358 F.3d 511, 515 (7th Cir. 2004)).

"The purpose of a motion to dismiss [pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits." *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990) (quotation marks and citation omitted). As described above, the Court construes the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded facts alleged, and drawing all plausible inferences in his favor. *Jackson*, 833 F.3d at 862; *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion to dismiss for failure to state a claim, a complaint must comply with Rule 8(a)(2) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief," such that the defendant is given "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (quotation marks and citation omitted). Further, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The Supreme Court has explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This plausibility standard is not analogous to a

"probability requirement" but, rather, "it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

"[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (quotation marks, brackets, and citation omitted). The factual allegations contained in the complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations omitted). To meet the plausibility standard outlined in *Twombly*, "the complaint must supply 'enough fact to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations." *Indep. Tr. Corp. v. Stewart Info. Servs. Corp.*, 665 F.3d 930, 935 (7th Cir. 2012) (quoting *Twombly*, 550 U.S. at 556).

## ANALYSIS

Defendants seek dismissal of Plaintiff's federal discrimination claim (Count I) pursuant to Federal Rule of Civil Procedure 12(b)(6); his state defamation claim (Count II) pursuant to Federal Rules 12(b)(1) and 12(b)(6), and his state retaliatory discharge claim (Count III) under Rule 12(b)(6). The Court considers each count in turn.

### A. Count I: Title VII Discrimination

Count I of Plaintiff's Complaint brings a claim of discrimination based on race, ethnicity, and national origin in violation of Title VII of the Civil Rights Act of 1964. (Compl. ¶¶ 43-47, ECF No. 1). Defendants seek dismissal of Count I on two bases: (1) Plaintiff was an independent contractor rather than an employee, and thus cannot seek the requested relief under Title VII; and (2) even if Plaintiff was an employee, the alleged conduct is insufficient to establish a colorable claim of disparate treatment or hostile environment harassment. (Br. Supp. 11-19, ECF No. 11).

Title VII's anti-discrimination provision makes it "an unlawful employment practice for an employer . . . to discharge any individual[] or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C.s § 2000e-2. The Seventh Circuit Court of Appeals "[has] stated, on numerous occasions, that a plaintiff alleging employment discrimination under Title VII may allege these claims quite generally." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Indeed, "[a] complaint need not 'allege all, or any, of the facts logically entailed by the claim,' and it certainly need not include evidence." *Id.* (quoting *Bennett v. Schmidt*, 153 F.3d 516, 518 (7th Cir. 1998)).

*1. Employee Versus Independent Contractor*

Independent contractors "[do] not fall within the protections of Title VII." *Alam v. Miller Brewing Co.*, 709 F.3d 662, 667-68 (7th Cir. 2013). Therefore, "a plaintiff 'must prove the existence of an employment relationship in order to maintain a Title VII action.'" *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 492 (7th Cir. 1996), *as amended on denial of reh'g and reh'g en banc* (Feb. 7, 1997) (quoting *Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 380 (7th Cir. 1991)). "In determining whether a business relationship is one of employee-employer, courts look to the 'economic realities' of the relationship and the degree of control the employer exercises over the alleged employee." *Knight*, 950 F.2d at 380 (quotation marks and citation omitted). Therefore, an employment relationship can be indirect; the parties do not need to formally define it as such, and an employee can have more than one employer. *See Frey v. Coleman*, 903 F.3d 671, 677 (7th Cir. 2018).

The Court focuses on five factors to determine whether an individual is an employee or an independent contractor:

(1) the extent of the employer's control and supervision over the worker, including directions on scheduling and performance of work, (2) the kind of occupation and nature of skill required, including whether skills are obtained in the workplace, (3) responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations, (4) method and form of payment and benefits, and (5) length of job commitment and/or expectations.

*Alexander*, 101 F.3d at 492 (quoting *Ost v. W. Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 436 (7th Cir. 1996)). The Seventh Circuit Court of Appeals has explained that "the employer's right to control is the most important [factor] when determining whether an individual is an employee or an independent contractor." *Knight*, 950 F.2d at 378. "Thus, '[i]f an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist.'" *Alexander*, 101 F.3d at 493 (quoting *Ost*, 88 F.3d at 439).

Defendants assert that Plaintiff was an independent contractor. (Br. Supp. 11-16, ECF No. 11). To support this assertion, Defendants attach to their motion an exhibit purportedly reflecting the agreement between Rush and CCNI ("the Services Agreement"). (Br. Supp. Ex. A, ECF No. 11-1). Defendants argue that the Service Agreement establishes that Plaintiff was an employee of Rush, not the Community Hospital or CCNI, and that Plaintiff's own admission that he was an employee of Rush further demonstrates that he did not have an employment relationship with the other entities. (Br. Supp. 12, ECF No. 11).

Defendant further argue, with reference to the *Alexander* factors, that CCNI and the Community Hospital did not exert control over Plaintiff's work environment in a way that would create an employer-employee relationship. *Id.* at 12. Specifically, Defendants note that Plaintiff is a highly skilled surgeon; that the Services Agreement allowed for termination of the contract without cause within 120 days, and thus a long-term job expectation was unreasonable; that Plaintiff exercised his independent medical judgment when treating patients; and that, while the

6

Complaint does not specifically state how Plaintiff was paid, the facts alleged lead to a reasonable inference that Rush paid him, rather than CCNI or the Community Hospital. *Id.* at 14.

Plaintiff counters that the Court cannot rely on materials outside the Complaint, such as the Services Agreement, on a motion to dismiss brought pursuant to Rule 12(b)(6). (Resp. at 9, ECF No. 15). Moreover, Plaintiff argues that the Complaint sufficiently alleges an employment relationship between Plaintiff, CCNI, and the Community Hospital. *Id.* at 10. Plaintiff points to his allegation that CCNI and the Community Hospital directly dictated the details, scheduling, and performance of his work. *Id.* at 10-11. Plaintiff further argues that the Community Hospital and CCNI, via Dr. Kumar, directly controlled the manner and means by which Plaintiff provided medical services. *Id.* at 11. Finally, Plaintiff points to his allegation that CCNI and the Community Hospital provided and withheld from him the equipment needed to perform his work. *Id.* at 12.

The Court will consider the Services Agreement in reaching a determination on the motion. The general rule is that documents outside the pleadings are not considered:

> If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d). However, there are exceptions to the rule. "It is . . . well-settled in this circuit that 'documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss.'" *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) (quoting *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994). "While narrow, this exception is 'aimed at cases interpreting, for example, a contract.'" *Id.* (quoting *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998)).

Here, Plaintiff's Complaint explicitly refers to the Services Agreement between Rush and CCNI:

> 9. Pursuant to an agreement between Rush and CCNI, Dr. Kass-Hout was credentialed with Community Hospital, which is wholly owned and operated by CCNI, and was assigned to cover Community Hospital's health system.

> 10. The agreement between Rush and CCNI was signed on behalf of CCNI by Allen Kumar ("Kumar"), CCNI's Administrator.

(Compl. ¶¶ 9-10, ECF No. 1). The agreement set some of the terms of Plaintiff's work at the hospital, and the terms of his work are central to his claim. As such, the Court will consider the Services Agreement in ruling on the instant motion.

The Services Agreement states that: (1) "[Rush] employs or contracts with licensed physicians (individually referred to herein as a 'Physician' and collectively referred to as the 'Physicians . . . . ;'" (2) "[Rush] agrees to provide: an employed neuroendovascular Physician to CCNI . . . . ;" and (3) "[i]n performing Services pursuant to this Agreement, [Rush] and reach of its Physicians are at all times acting as independent contractors." (Br. Supp. Ex. A ¶ D, p. 1; ¶ 1.1, p. 2; Art. VII, p. 5, ECF No. 11-1). On its face, it suggests that Plaintiff was an independent contractor. However, the "economic realities" of the relationship – not the language of the contract – determine whether there was an employer-employee relationship for Title VII purposes. *See Frey*, 903 F.3d at 676-77. As explained below, the Court finds that, accepting Plaintiff's allegations as true and drawing all reasonable inferences in his favor, Plaintiff has adequately stated a claim for relief under Title VII.

Turning to the *Alexander* factors, the Court begins with the extent of Defendants' control and supervision over Plaintiff, including directions on scheduling and performance of his work. On this factor, the Services Agreement states:

The parties[3] hereby acknowledge and agree that neither CCNI nor [Rush] have or exercise any control or direction over the specific methods by which Physicians provide professional services and practice medicine, including the Services. Nothing contained in this Agreement requires referrals to health care facilities, interferes with patients' choice for medical treatment, or interferes with said Physicians' independent medical judgment.

(Br. Supp. Ex. A ¶ 2.5, p. 3, ECF No. 11-1). The Complaint contains the following allegations:

14. While Dr. Kass-Hout was at Community Hospital, Kumar dictated Dr. Kass-Hout's working schedule, requiring him to work seven (7) days per week and to be on call at all times, without being paid for part of the time.

15. Kumar also dictated how Dr. Kass-Hout was to provide medical services at Community Hospital, including by requiring Dr. Kass-Hout to consult with a Community Hospital cardiologist on cases even though there was no medical reason to do so.

16. Kumar also told Dr. Kass-Hout that he was not allowed to refer patients to any cardiologist other than the cardiologist at Community Hospital.

. . .

23. Kumar forced Dr. Kass-Hout to provide stroke care using a single-plane angiography suite, even though the standard of care demands the use of a bi-plane angiography suite.

24. When Dr. Kass-Hout complained to Kumar that this violated the standard of care, Kumar told him "It is my standard of care" and insisted that Dr. Kass-Hout perform the procedures per Kumar's direction.

. . .

27. Kumar repeatedly demanded that Dr. Kass-Hout stop seeing patients in order to meet with Kumar.

. . .

31. Kumar also refused to provide Dr. Kass-Hout with an appropriate dictation system for radiology procedures which Dr. Kass-Hout was performing; ultimately, after a number of weeks, the radiology department provided Dr. Kass-Hout with the necessary equipment, but only because billings began to suffer.

---

[3] Plaintiff himself was not a party to the Services Agreement. *See* (ECF No. 11-1 at 1).

(Compl. ¶¶ 14-16, 23-24, 27, 31, ECF No. 1).

Construing these allegations in the light most favorable to Plaintiff, and drawing all reasonable inferences in his favor, these allegations indicate a level of control and supervision over Plaintiff that weighs in favor of him being Defendants' employee. The facts of *Alexander* itself are instructive by comparison. In *Alexander*, the plaintiff, a physician affiliated with a hospital, "had the authority to exercise his own independent discretion concerning the care he delivered to his patients based on his professional judgment." 101 F.3d at 493. The doctor "was not required to admit his patients to [the defendant hospital]; and he was free to associate himself with other hospitals if he wished to do so." *Id.* The Court of Appeals explained that the doctor's requirement to be "on call" a specified amount of time per week and the fact that the hospital assigned him patients did not amount to a level of control that indicated an employee-employer relationship. *Id.*

Here, however, Plaintiff alleges that Defendants directed the performance of his work in numerous respects. He alleges that Dr. Kumar dictated how Plaintiff was to provide medical services, refused to provide him with appropriate equipment for certain procedures, interfered with his ability to see patients, forbade him from referring patients to cardiologists outside the Community Hospital, and required him to consult with other physicians on cases when Plaintiff felt there was no medical reason to do so. (Compl. ¶¶ 15, 16, 23-24, 27, 31, ECF No. 1). Although Rush and CCNI apparently agreed with each other that they were not exercising control over Plaintiff, the Court does not assume their version of the facts in assessing the motion to dismiss. Contrary to the situation in *Alexander*, the inference from Plaintiff's own allegations is that he lacked the authority to exercise his own independent discretion concerning the care he delivered to his patients. The facts alleged here are more akin to those in *Levitin v. Northwest Community Hospital*, in which the court found that the plaintiff's factual allegations, "deemed true at the

pleading stage, provide[d] plausible grounds to conclude that [the plaintiff] was [the defendant hospital's] employee under the *Alexander* standard." 64 F. Supp. 3d 1107, 1124 (N.D. Ill. 2014). Specifically, the defendant allegedly

> control[led] which facilities, equipment, instruments, and staff [the plaintiff] could use in surgery; dictat[ed] the scope of her duties and responsibilities for her patients and controlling which general surgeries and procedures she was permitted to perform; determine[ed] the schedule for her surgeries; and prescribe[ed] the form, content, and deadlines of the documents that she was required to prepare for each patient.

*Id*. The level of control alleged in the instant case similarly exceeds that alleged in *Alexander*, and goes well beyond what Defendants refer to as merely "administrative controls." (Reply at 11, ECF No. 16). Although Defendants cite several cases[4] in which various forms of control were found insufficient to establish that a physician was an "employee," (Br. Supp. at 13, ECF No. 11), none is as severe as the allegation that Dr. Kumar forced Plaintiff to violate the standard of care because the procedure in question was "my standard of care." (Compl. ¶ 24, ECF No. 1). This factor weighs in favor of the existence of an employee-employer relationship.

The Court next examines Plaintiff's occupation and skills. *See Alexander*, 101 F.3d at 492. "The amount of skill required to complete a job is indicative of employment status. The skill factor focuses on whether the work requires performance by someone who is 'highly educated or skilled' because such workers are less likely to submit to the hiring party's control." *In re FedEx Ground Package Sys., Inc.*, 869 F. Supp. 2d 942, 987 (N.D. Ind. 2012). Plaintiff alleges that he is "an accomplished Syrian Arab Endovascular-neurosurgeon specializing in stroke treatment and care." (Compl. ¶ 1, ECF No. 1). As with the plaintiff in *Alexander*, he appears to

---

[4] However, the Court disagrees with Plaintiff's argument that Defendants conflated the applicable legal standards for this motion by citing to cases resolved at the summary judgment stage (Resp. at 9-10, ECF No. 15). "[T]here's nothing wrong with relying on summary-judgment cases at the pleading stage to explain the substantive legal standards that apply to the case." *Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014).

"possess significant specialized skills." 101 F.3d at 493. This factor weighs in favor of Plaintiff being an independent contractor.

Turning to the third factor, the Court considers the responsibility for the costs of operation, such as equipment, supplies, fees, licenses, workplace, and maintenance of operations. *See Alexander*, 101 F.3d at 492. On this factor, the Complaint contains the following allegations:

> 11. While working at Community Hospital, Dr. Kass-Hout was required to apply for membership in Community Hospital's medical staff pursuant to Community Hospital's bylaws.
>
> 12. Dr. Kass-Hout was also required to discharge his duties in accordance with Community Hospital's bylaws, rules, and regulations as well as the bylaws, policies, and procedures of CCNI.
>
> 13. Dr. Kass-Hout was required to submit any and all disputes regarding his employment through Community Hospital and CCNI.
>
>  . . .
>
> 23. Kumar forced Dr. Kass-Hout to provide stroke care using a single-plane angiography suite, even though the standard of care demands the use of a bi-plane angiography suite.
>
>  . . .
>
> 31. Kumar also refused to provide Dr. Kass-Hout with an appropriate dictation system for radiology procedures which Dr. Kass-Hout was performing; ultimately, after a number of weeks, the radiology department provided Dr. Kass-Hout with the necessary equipment, but only because billings began to suffer.

(Compl. ¶¶ 11-13, 23, 31, ECF No. 1). The Services Agreement, in turn, provides:

> CCNI shall be solely responsible to bill and collect for all services provided by CCNI hereunder, as well as Clinical Services provided by Physician in the inpatient and outpatient setting. [Rush] shall assist CCNI as reasonably requested in the billing and collection of funds for Clinical Services, including completion of all documentation necessary to allow CCNI to bill any professional fees for Clinical Services. Service Provider agrees that Physician will be and remain a participating provider in those third-party payor arrangements and managed care plans in which [Community Hospital] is or does become a participating provider throughout the term of this Agreement and a participating provider in Community Healthcare Partners.

12

(Br. Supp. Ex. A ¶ 6.3, p. 5, ECF No. 11-1). As the Seventh Circuit has explained, "[i]f an entity bears costs of operation—such as for equipment or office space—an employee/employer relationship is more likely." *Worth v. Tyer*, 276 F.3d 249, 264 (7th Cir. 2001). While the Complaint is silent as to the party responsible for maintaining Plaintiff's professional license, the allegations nonetheless indicate that Defendants were responsible for and/or exercised control over equipment, supplies, maintenance of operations in the workplace, and membership in the Community Hospital's medical staff, for which Plaintiff was required to apply. The Services Agreement further indicates that CCNI was solely responsible for billing and collecting for all services provided by Plaintiff. Overall, this factor weighs in favor of Plaintiff being Defendants' employee.

The fourth factor is the method of payment and benefits. *See Alexander*, 101 F.3d at 492. The Complaint alleges, in relevant part:

> 8. In March, 2018, Dr. Kass-Hout began working with Rush University Medical Center ("Rush") as an Assistant Professor in the Department of Neurosurgery, with a conjoint appointment in the Department of Neurological Services.
>
> 9. Pursuant to an agreement between Rush and CCNI, Dr. Kass-Hout was credentialed with Community Hospital, which is wholly owned and operated by CCNI, and was assigned to cover Community Hospital's health system.

(Compl. ¶¶ 8-9, ECF No. 1). The Services Agreement notes that "[a]s consideration for the Clinical Services[5] provided under this Agreement, CCNI shall pay [Rush] the amounts listed in Exhibit A." (Br. Supp. Ex. A ¶ 6.1, p. 5, ECF No. 11-1). The evidence that Rush paid Plaintiff for his work, rather than CCNI or the Community Hospital, weighs in favor of the existence of an independent contractor relationship.

---

[5] The term "Clinical Services" refers to the services provided by "an employed neuroendovascular Physician." Br. Supp. Ex. A ¶ 1.1, p. 2.

13

Finally, the Court considers the length of the job commitment and/or the parties' expectations for how long the job would last. *See Alexander*, 101 F.3d at 492. An agreement that sets a maximum term of employment, or otherwise cuts against an expectation of ongoing employment, can support an inference that a worker is an independent contractor. *See E.E.O.C. v. N. Knox Sch. Corp.*, 154 F.3d 744, 750 (7th Cir. 1998). Here, the Services Agreement specifies an initial term of three years, to be automatically renewed for successive one-year periods unless terminated by the parties. (Br. Supp. Ex. A ¶ 9.1, p. 7, ECF No. 11-1). Drawing all reasonable inferences in Plaintiff's favor, this suggests that the position was ongoing and indefinite in length. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 906 (7th Cir. 2018) (workers' "expect[ation] to stay in their positions indefinitely" supported inference of employer/employee relationship). After the contract was terminated, Dr. Kumar allegedly replaced Plaintiff with Dr. Badruddin (Compl., ¶ 36); this allegation cuts both ways, in that Plaintiff's own job was not permanent but the position itself was ongoing. On the limited facts available, construing the allegations in the light most favorable to Plaintiff, the Court finds that this factor weighs in favor of Plaintiff being Defendants' employee.

In sum, having considered the allegations in the Complaint and Services Agreement against the applicable Rule 12(b)(6) standard, the Court finds that two of the factors outlined in *Alexander* weigh in favor of Plaintiff being an independent contractor, while three suggest the existence of an employee-employer relationship. Critically, the most important factor in determining whether Plaintiff is an employee or an independent contractor—Defendants' right to control his work— supports an inference of an employee-employer relationship. Accordingly, the Court finds that Plaintiff has adequately alleged that he is Defendants' employee such that he may seek relief under Title VII.

*2. Discrimination Claim*

Alternatively, Defendants seek to dismiss Count I on the basis that Plaintiff did not plead facts showing that he suffered an adverse action because of discrimination, or that he suffered a hostile work environment. A plaintiff can defeat a motion to dismiss a Title VII discrimination claim by alleging that "the employer instituted a (specified) adverse employment action against the plaintiff on the basis of [his protected status]." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008). An adverse employment action is typically "a significant change in employment status, such as hiring, firing, [or] failing to promote." *Lewis v. City of Chi.,* 496 F.3d 645, 653 (7th Cir. 2007). The allegation must be accompanied by facts sufficient to raise an inference of discriminatory intent. *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 886 (7th Cir. 2012) (citing *Iqbal*, 556 U.S. at 679)).

Plaintiff identifies several adverse actions with allegedly discriminatory motive: his being on call 24/7 while other doctors were excused from being on call (Compl. ¶ 22, ECF No. 1); his "demotion" to working under Badruddin (*id*., ¶ 32); and the subsequent termination of the Services Agreement, which removed his own position (*id*., ¶ 36). Defendants argue that Plaintiff's complaints about his working conditions do not establish "adverse actions," and that the termination was not adverse to Plaintiff because only CCNI and Rush were parties to the contract. (Br. Supp. 19, ECF No. 11). The Court does not attempt to determine whether all of Plaintiff's alleged working conditions were adverse as defined by Title VII, because the Complaint plausibly alleges that his hours and position were reduced because of his national origin and race.

Defendants stress that they did not take any action against Plaintiff directly, but instead indirectly ended his employment by cancelling a contract to which he was a non-party. However, Defendants provide no legal authority showing that this distinction is relevant, nor has the Court's

research revealed any such authority. Plaintiff avers a Title VII claim if he plausibly alleges, as he does here, that the adverse action[6] was taken for a discriminatory purpose. The purpose of the action, not the method, is what matters. The Services Agreement does not shield Defendants from the allegation that they discriminated based on race or national origin. *See, e.g., E.E.O.C. v. Indiana Bell Tel. Co.*, 256 F.3d 516, 522 (7th Cir. 2001) ("strongly impl[ying]" that labor agreements do not exculpate conduct that would violate Title VII if prescribed unilaterally by employers).

Next, the Court considers whether Plaintiff has sufficiently alleged that the adverse action was due to discriminatory motive. Plaintiff offers several facts supporting an inference that he was terminated because of his race and national origin:

> 19. In September, 2018, soon after Dr. Kass-Hout started covering Community Hospital, Kumar told Dr. Kass-Hout that "Syrians are like cockroaches", in reference to the number of Syrian Arab medical personnel at Community Hospital. . . .

> 25. Kumar repeatedly accused Dr. Kass-Hout of being unable to perform procedures and demeaned his credentials, even though Dr. Kass-Hout's treatment was well within the standard of care.

> 26. Kumar sent several of Dr. Kass-Hout's cases to Rush for review, accusing Dr. Kass-Hout of performing substandard work, but Rush advised that all cases were within the standard of care. . . .

> 28. When Kumar saw Dr. Kass-Hout talking with several Arab intensivists and pulmonary specialists, he told Dr. Kass-Hout he was planning on pushing them out of Community Hospital and said he "will not take it lightly" if he saw Dr. Kass-Hout speaking with them again.

---

[6] Defendants also argue that "[i]n contrast to the circumstances in *Alexander*, Community Hospital did not revoke [Plaintiff's] staff privileges and did not prevent him from providing medical services at Community Hospital." (Br. Supp. 14, ECF No. 11) To the extent Defendants argue that Plaintiff's separation was not an "adverse action" because he still retained medical staff privileges at Community Hospital, that argument also fails. An adverse action occurs when "the employee's compensation, fringe benefits, or other financial terms of employment are diminished." *Nichols v. S. Illinois Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007) (quoting *O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004)). Given Plaintiff's allegation that he has lost 2/3 of his salary (Compl. ¶ 40), Defendants' action against Plaintiff was an "adverse action" for Title VII purposes.

29. When Dr. Kass-Hout postponed a meeting with Kumar due to a prior obligation at a research conference, Kumar called Dr. Kass-Hout's chairman at Rush and falsely accused Dr. Kass-Hout of shirking his duties at Community Hospital and spending too much time at Rush.

. . .

33. Kumar asked Dr. Kass-Hout why he would not agree to work under Badruddin, and Dr. Kass-Hout replied, "I don't believe in arranged marriage and I like to meet my partner before working with him." Kumar responded, "Why? Arranged marriage is the core of your culture."

. . .

36. On or about May 31, 2019, Kumar terminated the contract with Rush, replacing Dr. Kass-Hout with Badruddin.

Viewed in combination, these allegations support a plausible inference that Defendants, through Dr. Kumar, dismissed Plaintiff based on dishonest assertions of substandard care, at least in part because he was a Syrian Arab doctor. The fact that the Complaint suggests other contributing reasons – such as Plaintiff's opposition to working under Dr. Badruddin – is irrelevant; the discrimination only needs to be a "motivating factor . . . even [if] other factors also motivated" the termination. 42 U.S.C.A. § 2000e-2(m); *see also E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 773 (2015). Plaintiff has pled facts sufficient to support an inference that he suffered an adverse action because of discrimination, and there can proceed on his Title VII claim.

### B. Count II: Defamation

Count II of Plaintiff's Complaint brings a claim of defamation under Indiana state law. (Compl. ¶¶ 48-53, ECF No. 1). Defendants seek dismissal of Count II on two bases: (1) Plaintiff failed to establish supplemental jurisdiction under 18 U.S.C. § 1367(a), and therefore Count II must be dismissed per Rule 12(b)(1); and (2) even if Plaintiff established supplemental jurisdiction over his state law defamation claim, he nonetheless failed to state a claim for vicarious liability

against CCNI or the Community Hospital, and therefore Count II must be dismissed as to these two Defendants per Rule 12(b)(6). (Br. Supp. 6-11, ECF No. 11).

The Court can exercise supplemental jurisdiction over "all other claims that are so related to claims in the action within [ ] original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). Claims form part of the same case or controversy when they "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966). To satisfy this requirement, a "loose factual connection between the claims is generally sufficient." *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 683 (7th Cir. 2014). The factual overlap must relate to the elements "necessary to establish" each claim. *See, e.g., Geiser v. Goshen Health Sys. Inc.*, No. 3:17-CV-864 JD, 2018 WL 3619796, at *3 (N.D. Ind. July 30, 2018) (listing cases); *Ballentine v. Birkett*, No. 2:12-CV-236-TLS, 2013 WL 3467193, at *2 (N.D. Ind. July 10, 2013). In this case, Defendants argue that the Title VII claim is insufficiently related to the state law defamation claim to sustain supplemental jurisdiction over the defamation claim.

The Court notes that it is unclear exactly which statements form the basis for the defamation claim. The Complaint generally indicates that the defamation claim is based on Dr. Badruddin's statements, which occurred after the Rush contract was terminated. (*See* Compl. ¶¶ 36-37, 49-52) ("Kumar terminated the contract with Rush . . . Badruddin subsequently began defaming Dr. Kass-Hout"; "The statements by CCNI and Community Hospital, through Dr. Badruddin, qualify as defamation *per se*"). Defendants argue that there is not enough factual overlap between the defamation and Title VII claims, in part because Dr. Badruddin's statements were made after the alleged adverse action had already occurred. However, in briefing, Plaintiff refers to "Kumar's defamatory statements" (Resp. Br. 5) as an example of the required factual overlap. The Court does not attempt to resolve the question of which of Dr. Kumar's statements,

if any, support the defamation claim. Nonetheless, these claims are sufficiently related to permit the Court to exercise supplemental jurisdiction. Plaintiff has plausibly alleged that Dr. Badruddin's claims, although made after the termination of the Services Agreement, were part of an alleged pattern of discriminatory conduct by Defendants that cost Plaintiff his job and limited him from obtaining further work. (*See* Compl. ¶¶ 37-40).

Contrary to Defendants' suggestion, the fact that the alleged defamation occurred after Plaintiff's separation does not preclude factual overlap between the claims. To prove defamation, Plaintiff must show that the communication was made with defamatory imputation, malice, publication, and damages. *Trail v. Boys & Girls Clubs of N.W. Ind.*, 845 N.E.2d 130, 136 (Ind. 2006). To sustain a defamation claim, the statement must not only be "defamatory" in the sense of harming one's reputation, but also false. *Miller v. Cent. Ind. Cmty. Found., Inc.*, 11 N.E.3d 944, 956 (Ind. Ct. App. 2014). And as described above, a plaintiff can state a Title VII action by showing that the employer instituted an adverse employment action against the plaintiff based on his protected status. *Tamayo*, 526 F.3d at 1084.

In this case, Plaintiff alleges that Dr. Badruddin "falsely stated that Dr. Kass-Hout: (1) had an unacceptable complication rate, ranging from 50% to 100%; (2) had 'horrible' surgical outcomes; and (3) had hemorrhagic complications." (Compl. ¶ 38). To evaluate the defamation claim, a factfinder would have to assess whether these statements were false. That bears directly on whether the termination was discriminatory, because Plaintiff was allegedly accused of "substandard work" as a pretext for Defendants removing him from his position. If Dr. Badruddin's alleged representations were truthful, that casts doubt on the accusation, central to the Title VII claim, that Defendants discriminated against him because of his protected status. Plaintiff must also show "malice" for his defamation claim – *i.e.*, that Defendants knew the statements were

19

false when they were published – which could have the same implications. It also appears that the damages inquiry for each claim would overlap, since Plaintiff is likely to claim alleged damage to his career prospects for both claims.

This Complaint is not a grab bag of disconnected allegations between employer and employee: Plaintiff is alleging a course of conduct – Defendants' allegedly dishonest conclusions and pronouncements about his abilities as a doctor – that gives rise to a Title VII claim and a defamation claim. *Cf. Geiser*, 2018 WL 3619796, at *1-2 (declining to exercise supplemental jurisdiction over a contract dispute involving an employee's termination payments, based on an FMLA claim unrelated to the termination). The Court is satisfied that these claims have a common nucleus of operative fact, such that a plaintiff could rightly expect to "try them [. . .] in one judicial proceeding." *Gibbs*, 383 U.S. at 725.

Finally, Defendants seek to dismiss the defamation claim against CCNI and Community Hospital, because Plaintiff has not shown that they should be subject to vicarious liability for Dr. Badruddin's statements. (Br. Supp. 10-11). In Indiana, vicarious liability under the doctrine of *respondeat superior* arises only from an employee's actions "within the scope of employment." *Barnett v. Clark*, 889 N.E.2d 281, 283 (Ind. 2008). An act falls within the scope of employment when the employer authorizes that act or conduct incidental to it, or the act "to an appreciable extent[] further[s] the employer's business." *Id*. at 284 (citations omitted). By contrast, an "independent course of conduct not intended by the employee to serve any purpose of the employer" falls outside the scope of employment. *Id*. (emphasis omitted) (quoting Restatement (Third) of Agency, § 7.07(2) (2006)). Defendants argue that no facts in the Complaint show that Dr. Badruddin made the allegedly defamatory statements in the scope of his employment for CCNI or Community Hospital.

Plaintiff argues that at the pleading stage, this point can be sufficiently established with "generalized" facts indicating that Dr. Badruddin was an agent of the other defendants. *Cunningham v. Foresters Fin. Servs., Inc.*, 300 F. Supp. 3d 1004, 1015 (N.D. Ind. 2018). Although "[t]he question of whether an agency relationship *exists* is normally a question of fact" to be assessed later in the case, *Clarendon Nat'l Ins. Co. v. Medina*, 645 F.3d 928, 935 (7th Cir. 2011) (emphasis added), that does not relieve Plaintiff of his burden to plead "'enough fact to raise a reasonable expectation that discovery will reveal evidence' supporting the plaintiff's allegations" that these comments were actually within the scope of employment. *Indep. Tr. Corp.*, 665 F.3d at 935 (quoting *Twombly*, 550 U.S. at 556). The mere allegation that Dr. Badruddin is an employee of CCNI and Community Hospital does not necessarily entitle Plaintiff to proceed on a claim based on vicarious liability.

However, Plaintiff points to two plausible inferences that would show not only that Dr. Badruddin was Defendants' agent, but that the allegedly wrongful actions were done in the scope of Dr. Badruddin's employment to benefit CCNI and the Community Hospital. One is that Dr. Badruddin's statements disparaging Plaintiff's performance were intended to distance the hospital from Plaintiff's allegedly poor work, within the medical community; another is that Dr. Badruddin's statements would serve to siphon patient referrals away from Plaintiff and toward Dr. Badruddin and Community Hospital. (Resp. Br. 8-9).

Defendants point out that even at the pleading stage, the fact that Dr. Badruddin's comments concerned Plaintiff's work does not necessarily support an inference that they were within the scope of employment. However, in the case cited by Defendants for that premise, the allegedly wrongful conduct was perpetrated by one next-door neighbor against another. *Small v. The Anchorage Homeowners Ass'n, LLC*, 2019 WL 1317636, at *2 (S.D. Ind. Mar. 21, 2019). It

was clear that, although the offending neighbor happened to be a realtor, the plaintiff could not state a claim under the Fair Housing Act for discrimination in a sale or rental: "The mere fact that [she] was a realtor does not mean every statement she makes is an advertisement." *Id*. at 5. In that case, the complaint strongly indicated that the comments had nothing to do with the declarant's employment. Not so here – there is no allegation that Dr. Badruddin knew of Plaintiff in any context other than their work for the hospital, and no basis to infer that Dr. Badruddin had any interest in Plaintiff except as the hospital defendants' employee. For these reasons, Plaintiff has presented sufficient facts to proceed on a defamation claim against CCNI and the Community Hospital based on Dr. Badruddin's statements on a theory of vicarious liability.

### C. Count III: Retaliatory Discharge

Count III of Plaintiff's Complaint brings a claim of retaliatory discharge. (Compl. ¶¶ 54-57, ECF No. 8). In response to the instant motion, Plaintiff withdraws this claim. (Resp. 19, ECF No. 15), and Count III will accordingly be dismissed.

### CONCLUSION

Based on the foregoing, the Court hereby **GRANTS in part** and **DENIES in part** Defendants' Motion to Dismiss Plaintiff's Complaint [DE 10]. The Court **DISMISSES with prejudice** Count III of Plaintiff's Complaint. The Court denies the request to dismiss the remaining claims.

So ORDERED this 20th day of August, 2021.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT