**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | | |
|---|---|---|
| DR. TAREQ KASS-HOUT, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No. 2:20-CV-441-JPK |
| | ) | |
| COMMUNITY CARE NETWORK INC.; | ) | |
| MUNSTER MEDICAL RESEARCH | ) | |
| FOUNDATION, INC., d/b/a THE COMMUNITY | ) | |
| HOSPITAL; AAMIR BADRUDDIN; and | ) | |
| ALAN KUMAR, | ) | |
| | ) | |
| *Defendants.* | ) | |

## OPINION AND ORDER

Presently before the Court is the motion filed by Defendants Community Care Network, Inc. ("CCNI"), The Community Hospital, and Dr. Alan Kumar, seeking dismissal of Count III of the Amended Complaint alleging a violation of 42 U.S.C. § 1981. [DE 36]. The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. [DE 13]. Therefore, this Court has jurisdiction pursuant to 28 U.S.C. § 636(c) to decide this motion. For the reasons discussed below, Defendants' motion is denied.

## BACKGROUND

For purposes of Defendants' motion to dismiss, the Court considers the facts alleged in Plaintiff's Amended Complaint [DE 31] in the light most favorable to Plaintiff, accepting as true all well-pleaded facts alleged and drawing all plausible inferences in Plaintiff's favor. *See Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 862 (7th Cir. 2016). Accordingly, the Court's recitation of

the facts rests heavily upon the allegations in the Plaintiff's Amended Complaint, without making any findings or comments regarding the veracity, or lack thereof, of such facts.

Plaintiff is an accomplished Syrian Arab endovascular neurosurgeon specializing in stroke treatment and care. [DE 31 ¶ 1]. In March 2018, Plaintiff began working for Rush University Medical Center ("Rush") as an Assistant Professor in the Department of Neurosurgery, with a conjoint appointment in the Department of Neurological Services. [*Id.* ¶ 9]. As part of his employment with Rush, Plaintiff provided neuroendovascular clinical services at The Community Hospital, a medical facility wholly owned and operated by CCNI. [*Id.* ¶ 10]. Those services were provided under an agreement between Rush, which "employs or contracts with licensed physicians ["Physicians"] … who possess the training, expertise, knowledge and qualifications to provide [ ] neuroendovascular clinical services" [DE 37-1, Whereas ¶ D], and CCNI, which "desire[d] to partner with an academic medical center to provide comprehensive care for patients in need of neuroendovascular procedures in the community it serves" [*id.*, Whereas ¶ C].

Pursuant to the Rush–CCNI agreement, Rush agreed to provide CCNI with one of its employed neuroendovascular Physicians to work at CCNI for "full time equivalent" [FTE], five days a week, 52 weeks a year, and provide in-patient and out-patient medical and clinical Services as set forth in the agreement. [*Id.* ¶ 1-1]. The agreement designates Rush and its Physicians as independent contractors. [*Id.,* Article VII]. The contracting parties were to mutually agree on which Physicians would provide services under the agreement. [*Id.* ¶ 2.3]. Physicians providing services to CCNI under the agreement were required among other things to maintain membership on the Medical Staff of The Community Hospital with hospital privileges, and to discharge their duties in accordance with the bylaws, rules and regulations of The Community Hospital and its Medical Staff as well as the bylaws and policies and procedures of CCNI. [*Id.,*¶ 2.1]. Complaints

2

regarding services rendered by provided Physicians were to be handled in accordance with written Community Hospital Medical Staff policies and applicable CCNI policies, which were to be made available to Physicians throughout the term of the agreement. [*Id.* ¶ 2.4]. During the term of the agreement, neither Rush nor any Physician was allowed to provide neuroendovascular program services on-site at any other acute service hospital or healthcare facility located in Lake County, Indiana without the written consent of CCNI, and Rush agreed to require each Physician employed or otherwise engaged by it to agree to this requirement. [*Id.* ¶ 12.2].

The Rush-CCNI Agreement was signed on behalf of CCNI by Defendant Kumar, a physician affiliated with CCNI who was acting as CCNI's Administrator. [DE 37-1 at 13; DE 31 ¶ 11]. Plaintiff alleges that Dr. Kumar was biased against Syrian Arab physicians, and that Defendants discriminated against him because of his race, ethnicity, and/or national origin. [DE 31 ¶¶ 19, 55]. In a previous opinion and order, the Court denied Defendants' motion to dismiss the claims in the original complaint (which are realleged in the Amended Complaint) for employment discrimination under Title VII and defamation. *See* [DE 17; *Kass-Hout v. Cmty. Care Network Inc.*, No. 2:20-CV-441-JPK, 2021 WL 3709635 (N.D. Ind. Aug. 20, 2021)]. The sole issue in the current motion is whether Count III of the Amended Complaint states a legally sufficient claim for a § 1981 violation.

## **STANDARD OF REVIEW**

Defendants cite both Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules of Civil Procedure as the basis for their dismissal motion. *See* [DE 36 at 1]. Rule 12(b)(1) allows a party to move to dismiss a claim for lack of subject matter jurisdiction, while a motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. *See* Fed. R. Civ. P. 12(b)(1), 12(b)(6). As will be discussed in greater detail, Defendants

3

argue that Plaintiff lacks standing to assert a discrimination claim under § 1981 because he was not a party to the Rush–CCNI Agreement. Defendants appear to invoke Rule 12(b)(1) under the understandable—if ultimately mistaken—belief that their standing argument calls into question the subject matter jurisdiction of this Court. It does not.

### A.    Rule 12(b)(1)

"A district court properly dismisses an action under Fed R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction if ... the plaintiff lacks constitutional standing to bring the action." *Cortlandt St. Recovery Corp. v. Hellas Telcomms., S.A.R.L.*, 790 F.3d 411, 416–17 (2d Cir. 2015) (internal quotation marks and citation omitted). Constitutional standing, also known as "[s]tanding under Article III, is a threshold question in every federal case …. A federal court's jurisdiction can be invoked only ... when the plaintiff ... has suffered some threatened or actual injury resulting from the putatively illegal action[.]'" *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 616 (7th Cir. 2015) (internal quotation marks and citations omitted). "Importantly, [Article III standing does not require] a claimant … [to] establish that a right of his has been infringed; that would conflate the issue of standing with the merits of the suit." *Id.* (internal quotation marks and citation omitted). Conflation of the two concepts often occurs because "[t]he term 'statutory standing' is found in many cases, but it is a confusing usage." *Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) (internal citations omitted). Statutory standing "refers to a situation in which, although the plaintiff has been injured and would benefit from a favorable judgment and so has standing in the Article III sense, he is suing under a statute that was not intended to give him a right to sue; he is not within the class intended to be protected by it." *Id.*

Defendants' argument that Plaintiff lacks standing under § 1981 to assert a claim based on the Rush–CCNI Agreement because he is not a party to that agreement raises an issue of statutory standing, which does "not implicate the jurisdiction of the district court." *Ameritech Ben. Plan Comm. v. Commc'n Workers of Am.,* 220 F.3d 814, 819 (7th Cir. 2000). While Defendants make the additional argument that Plaintiff's injuries do not arise from the alleged breaches of the Rush–CCNI Agreement, that argument too does not call into question whether Plaintiff has suffered an Article III injury. *See, e.g., Rothstein v. UBS AG,* 708 F.3d 82, 91 (2d Cir. 2013) (constitutional standing requires only that the injury be "fairly traceable" to the defendant's acts, which is a lower standard than the standard for proximate causation); *see also Dep't of Com. v. New York,* — U.S. —, 139 S. Ct. 2551, 2566 (2019) ("Article III requires no more than *de facto* causality" (internal quotation marks and citation omitted)). Accordingly, notwithstanding Defendants' use of the term "standing" to describe their dismissal arguments, Defendants' motion to dismiss is properly addressed under Rule 12(b)(6) and not Rule 12(b)(1). *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7,* 570 F.3d 811, 820-21 (7th Cir. 2009) (holding that the plaintiffs' failure to plead the state action necessary for maintaining an action pursuant to § 1983 raised an issue under Rule 12(b)(6) rather than Rule 12(b)(1)).

**B.    Rule 12(b)(6)**

Federal Rule of Civil Procedure 8(a) provides, in part: "[a] pleading that states a claim for relief must contain: ... a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Dismissal under Rule 12(b)(6) is required, however, if the complaint fails to describe a claim that is plausible on its face. *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 510 (7th Cir. 2009) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). While a complaint is not required to contain detailed factual allegations," a plaintiff's obligation to provide the

5

'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). The Seventh Circuit has instructed that plaintiffs must do more than "merely parrot the statutory language of the claims that they are pleading (something that anyone could do, regardless of what may be prompting the lawsuit), rather than providing some specific facts to ground those legal claims." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). The court clarified the standard for dismissal under Rule 12(b)(6) as follows:

> First, a plaintiff must provide notice to defendants of her claims. Second, courts must accept a plaintiff's factual allegations as true, but some factual allegations will be so sketchy or implausible that they fail to provide sufficient notice to defendants of the plaintiff's claim. Third, in considering the plaintiff's factual allegations, courts should not accept as adequate abstract recitations of the elements of a cause of action or conclusory legal statements.

*Id.*

Generally, in ruling on a motion to dismiss under Rule 12(b)(6), a court may consider only the plaintiff's complaint. *Rosenblum v. Travelbyus.com Ltd*., 299 F.3d 657, 661 (7th Cir. 2002). However, "documents that are central to the complaint and are referred to in it" may also be considered by the court in ruling on a motion to dismiss. *Id.; see also Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013); *Brownmark Films, LLC v. Comedy Ptnrs.,* 682 F.3d 687, 690 (7th Cir. 2012). The Rush–CCNI Agreement is central to and referred to in the Amended Complaint, although not attached to it. However, Defendants attach a copy to their brief in support of their motion to dismiss. [DE 37-1]. Accordingly, the Court may consider that agreement in ruling on Defendants' motion. *See* [DE 17 at 7 (citing *188 LLC v. Trinity Indus., Inc*., 300 F.3d 730, 735 (7th Cir. 2002) (quoting *Wright v. Assoc. Ins. Cos. Inc.,* 29 F.3d 1244, 1248 (7th Cir. 1994))).

## DISCUSSION

Section 1981, passed as part of the Civil Rights Act of 1866, provides in relevant part as follows:

### § 1981 Equal rights under the law

**(a) Statement of equal rights**

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981(a). "Although § 1981 does not itself use the word 'race,' the [Supreme] Court has construed the section to forbid all 'racial' discrimination" in the activities protected by the statute. *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987) (citing *Runyon v. McCrary*, 427 U.S. 160, 168 (1976)). The rights accorded by this statute are protected against impairment by *nongovernmental*, as well as governmental, discrimination. *See* 42 U.S.C. § 1981(c). Further, the Supreme Court has held that § 1981 provides an aggrieved individual a private right of action to enforce the statute's prohibitions. *Jett v. Dallas Ind. Sch. Dist.,* 491 U.S. 701, 731-32 (1989) (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 728 (1979) (White, J., dissenting))). Count III of the Amended Complaint asserts a violation of the right encompassed in § 1981(a) "to make and enforce contracts." The term "make and enforce contracts" is defined to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). This provision, like Title VII, "affords a federal remedy against discrimination in private employment on the basis of race." *Johnson v. Ry. Express Agency, Inc.,* 421 U.S. 454, 460 (1975).

7

To establish a claim under § 1981, a plaintiff must show that (1) he is a member of a racial minority; (2) the defendants had an intent to discriminate on the basis of race; and (3) the discrimination related to the right to make and enforce contracts. *See Morris v. Office Max, Inc*., 89 F.3d 411, 413 (7th Cir. 1996). Defendants do not dispute that Plaintiff has adequately alleged that he is a member of a racial minority, and that the alleged discrimination he suffered was because of his race.[1] Defendants argue, however, that Plaintiff's allegations of discrimination, in the context of his employment by Rush to provide medical services at The Community Hospital pursuant to the Rush-CCNI Agreement, do not plausibly allege the third element requiring that the alleged discrimination relate to the right to make and enforce contracts. Plaintiff responds that he has adequately alleged discrimination relating to the right to make and enforce contracts with respect to both the Rush-CCNI Agreement and his employment agreement with Rush. The Court will consider each of these agreements in turn.

### A.    THE RUSH–CCNI AGREEMENT

Defendants argue that, because Plaintiff was not a party to the Rush-CCNI Agreement, he does not have standing to sue for discrimination in "the making, performance, modification, and termination of," or in the "enjoyment of all benefits, privileges, terms, and conditions of" that agreement. Defendants' argument is based on *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470 (2006). In *Domino's Pizza*, the sole shareholder and president of a corporation alleged

---

[1] In *Al–Khazraji,* the Supreme Court held, "[b]ased on the history of § 1981, ... that Congress intended to protect from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics," stating that "[s]uch discrimination is racial discrimination that Congress intended § 1981 to forbid, whether or not it would be classified as racial in terms of modern scientific theory." 481 U.S. at 613. *Al-Khazraji* involved a § 1981 claim brought by a citizen of the United States born in Iraq. *Id.* at 604.

discrimination in violation of § 1981 in connection with several construction contracts that the corporation had entered into with the defendants. *Id.* at 472-73. The question before the Supreme Court was "whether a plaintiff who lacks any rights under an existing contractual relationship with the defendant, and who has not been prevented from entering into such a contractual relationship, may bring suit under . . . § 1981." *Id.* at 472. The Court held in the negative, stating that "a plaintiff cannot state a claim under § 1981 unless he has (or would have) rights under the existing (or proposed) contract that he wishes 'to make and enforce.' Section 1981 plaintiffs must identify injuries flowing from a racially motivated breach of their own contractual relationship, not of someone else's." *Id.* at 479–80.

Plaintiff argues that although he is not a party to the Rush-CCNI Agreement, he has rights under that contract as a third–party beneficiary. In *Domino's Pizza*, the Supreme Court left open the question of whether a § 1981 claim can be based on contractual rights accorded by third-party beneficiary status. *Id.* at 476 n. 3. Defendants concede [DE 37 at 7], however, that in *Jones v. Local 520, International Union of Operating Engineers*, 603 F.2d 664 (7th Cir. 1979), the Seventh Circuit upheld a § 1981 claim based on interference with third-party beneficiary contractual rights. *Id.* at 665-66 ("In our view, the agreements create third party beneficiary rights in the white and black operating engineers who stand to benefit from the operation of the referral plan," and "[t]he appellants' complaint alleges … that the contractors have deprived the blacks of their beneficiary rights …. We find these allegations of a racially motivated deprivation of beneficiary rights sufficient to maintain an action under 1981."); *see also Smith v. Chi. Archdiocese,* No. 02 C 2261, 2004 WL 1375379, at *9 (N.D. Ill. June 17, 2004) ("The making and enforcement of a contract right under Section 1981 also includes third-party beneficiaries of a contract." (citing *Jones*)). Because Defendants do not contest the point, the Court will assume that a third–party beneficiary

9

of a contract can state a claim under § 1981 based on that contract. Defendants nevertheless argue that the Court should dismiss Plaintiff's § 1981 claim based on asserted third–party beneficiary rights for two reasons: (1) Plaintiff cannot show he is a third–party beneficiary of the Rush–CCNI Agreement, and (2) Plaintiff's damages were not caused by an impairment of those third–party beneficiary rights.

### 1.   WHETHER PLAINTIFF IS A THIRD–PARTY BENEFICIARY UNDER THE RUSH–CCNI AGREEMENT

For purposes of a § 1981 claim, "the federal courts look to the common law of the forum state to determine whether a contract was made or proposed under which the plaintiff would have rights as a third-party beneficiary." *Shumate v. Twin Tier Hosp., LLC*, 655 F. Supp. 2d 521, 535 (M.D. Pa. 2009) (citing *Mack v. AAA Mid-Atl., Inc.*, 511 F. Supp. 2d 539, 545 n. 2 (E.D. Pa. 2007) (citing 42 U.S.C. § 1988(a) and *Barfield v. Commerce Bank, N.A.*, 484 F.3d 1276, 1278 (10th Cir. 2007))); *see also ESG Tech. Servs., LLC v. Advantage Health Solutions, Inc.*, No. 1:09-cv-30-TWP, 2011 WL 2267550, at *4 (S.D. Ind. June 6, 2011) (applying Indiana law to determine third-party beneficiary status for purposes of § 1981 claim). Under Indiana law,

> [o]ne not a party to an agreement may nonetheless enforce it by demonstrating that the parties intended to protect him under the agreement by the imposition of a duty in his favor. To be enforceable, it must clearly appear that it was the purpose or a purpose of the contract to impose an obligation on one of the contracting parties in favor of the third party. It is not enough that performance of the contract would be of benefit to the third party. It must appear that it was the intention of one of the parties to require performance of some part of it in favor of such third party and for his benefit, and that the other party to the agreement intended to assume the obligation thus imposed. The intent of the parties should be gathered from the terms of the contract itself, considered in its entirety against the background of the circumstances known at the time of execution. However, the intent of the parties to benefit a third party is not to be tested by a rule any more strict or different

10

> than their intention as to other terms of the contract; it can be shown
> by specifically naming the third party or by other evidence.

*Kirtley v. McClelland*, 562 N.E.2d 27, 37 (Ind. Ct. App. 1990) (internal citations omitted); *see also*

*OEC–Diasonics, Inc. v. Major*, 674 N.E.2d 1312, 1315 (Ind. 1996) (quoting *Kirtley*). Indiana

courts have distilled these requirements into a three–part test:

> A third party beneficiary contract requires first, that the intent to
> benefit the third party be clear, second, that the contract impose a
> duty on one of the contracting parties in favor of the third party, and
> third, that the performance of the terms necessarily render to the
> third party a direct benefit intended by the parties to the contract.

*Mogensen v. Martz*, 441 N.E.2d 34, 35 (Ind. Ct. App. 1982). "The controlling factor," however,

"is the intent to benefit the third party." *Bowman v. Int'l Bus. Machs. Corp.*, 853 F. Supp. 2d 766,

769 (S.D. Ind. 2012) (citing *Luhnow v. Horn*, 760 N.E.2d 621, 628 (Ind. Ct. App. 2001)).

The parties disagree on whether the Rush–CCNI Agreement reveals an intent to benefit a

third party. To begin with, Defendants cite paragraph 13.2 of the agreement to argue that the

agreement affirmatively negates any such intent. Paragraph 13.2 states:

> **13.2  *Assignment*.** This Agreement and all the rights and
> benefits hereunder are personal to each of the parties hereof, and
> neither this Agreement nor any right or interest of either party
> herein, or arising hereunder, shall be voluntarily or involuntarily
> sold, transferred or assigned without the prior written consent of the
> other party. Any attempt at assignment without such written consent
> is void.

[DE 37-1 at 11]. Pointing to the language in the first sentence that the "rights and benefits" under

the agreement "are personal to each of the parties hereof," Defendants assert the agreement

"plainly states that the agreement's benefits exist for the parties alone." [DE 37 at 9].

11

Defendants' interpretation of paragraph 13.2 is not persuasive. "Under Indiana state law,[2] the court's goal in interpreting a contract is to 'give effect to the parties' intent as reasonably manifested by the language of the agreement.'" *Holmes v. Potter*, 552 F.3d 536, 539 (7th Cir. 2008) (quoting *Reuille v. Brandenberger Constr., Inc*., 888 N.E.2d 528, 532 (Ind. 2008)). "If a contract is ambiguous or uncertain and its meaning must be determined by extrinsic evidence, its construction is a matter for the fact finder. On the other hand, if an ambiguity arises because of the language used in the contract rather than extrinsic facts, its construction is purely a question of law." *Town of Plainfield v. Paden Eng'g Co.,* 943 N.E.2d 904, 909 (Ind. Ct. App. 2011) (internal citations omitted). "Reading the contract as a whole, [the court] attempt[s] to determine the intent of the parties at the time the contract was made." *Id.; see also City of Indianapolis v. Kahlo,* 938 N.E.2d 734, 742 (Ind. Ct. App. 2010) ("The original covenanters' intent must be determined from the specific language used and the situation as it existed at the time the covenant was made."). The court "construe[s] the language so as not to render any words, phrases, or terms ineffective or meaningless." *Paden Eng'g. Co., Inc*., 943 N.E.2d at 909. "Specific words and phrases cannot be read exclusive of other contractual provisions. Rather, the parties' intentions when entering into the contract must be determined by reading the contract in its entirety and attempting to construe contractual provisions so as to harmonize the agreement." *Kahlo,* 938 N.E.2d at 742; *see also OEC-Diasonics*, 674 N.E.2d at 1315 ("The contract must be read as a whole when trying to ascertain the parties' intent.").

---

[2] The Rush–CCNI Agreement provides that it is to be interpreted, construed, and enforced pursuant to Indiana law. [DE 37-1, ¶ 13.8].

12

Applying these rules here, the intent of the contracting parties with respect to the language in the first sentence of paragraph 13.2 about the rights and benefits under the contract being "personal to each of the parties hereof" cannot be determined "from a consideration of [those] individual words … read alone." *Art Country Squire, L.L.C. v. Inland Mortg. Corp.*, 745 N.E.2d 885, 889 (Ind. Ct. App. 2001). Read in context of the entire paragraph, that language speaks only to the right to assign the contract.[3] In contrast, a contractual provision that speaks to the issue of third–party beneficiaries, with the intention of precluding the assertion of third–party beneficiary rights, would read something like the following:

> *No Third–Party Beneficiaries.* Other than the indemnity rights under Article 17, (I) nothing contained in this Agreement is intended or shall be construed to confer upon any person or entity (other than the Parties hereto) any rights, benefits or remedies of any kind or character whatsoever, and (ii) no person or entity shall be deemed a third-party beneficiary under or by reason of this Agreement.

*Bowman,* 853 F. Supp. 2d at 769-70.

The Rush–CCNI Agreement has no provision either expressly disclaiming, or expressly permitting, third–party beneficiary rights. Accordingly, the Court must infer the contracting parties' intent regarding such rights "from the terms of the contract itself, considered in its entirety against the background of the circumstances known at the time of execution." *Kirtley,* 562 N.E.2d at 37.[4] Plaintiff argues an intent to create third–party beneficiary rights is shown by the provisions

---

[3] As Plaintiff points out, the term "personal" relates to the concept of assignability under Indiana law. *See Midtown Chiropractic v. Ill. Farmers Ins. Co.,* 847 N.E.2d 942, 945 (Ind. 2006) ("a contract-based chose in action is considered assignable unless it is purely personal in nature"); *Hart Conversions, Inc. v. Pyramid Seating Co.,* 658 N.E.2d 129, 131 (Ind. Ct. App. 1995) (stating that "a personal right cannot be assigned").

[4] In their reply brief, Defendants appear to suggest that no third–party beneficiary rights are created unless the contract expressly acknowledges them. *See* [DE 42 at 2 (citing *Doe v. Carmel Operator, LLC,* 160 N.E.3d 518, 522 (Ind. 2021), where the court said if parties "want to allow a nonsignatory

in the Rush–CCNI Agreement that impose obligations on CCNI in favor of "Physicians."[5] For

instance, the agreement provides that CCNI:

> will provide Physicians with a fully equipped angiography suite,
> adequate OR access with priority for emergency procedures;
> adequate office space; supplies and utilities, appropriate nursing,
> technical and support staff, including a full–time advanced practice
> provider; other equipment necessary to the Physicians' provision of
> Services; and, transcription services.

[DE 37-1, ¶ 3.2]. Defendants cite to a sentence following the above quoted language, which states

that "CCNI has sole discretion in determining whether [any future equipment purchases that will

be used in the provision of the Services] will be purchased" [*id.*], to argue that it "undermin[es]

---

… to also enforce the agreement when a dispute arises[,] … the parties must make it explicit in the contract"). But the Indiana Supreme Court has long held that the contracting parties' intent to create third party beneficiary rights "is [not] to be tested by any stricter or different rule than their intention as to other terms of the contract." *Freigy v. Gargaro Co.*, 223 Ind. 342, 349, 60 N.E.2d 288, 291 (1945). Acknowledging other cases in which "[t]he words 'clearly appear'" are used, the *Freigy* court stated that a "slightly different and ... more accurate" formulation of the rule was that third party beneficiary status "must affirmatively appear from the language of the instrument *when properly interpreted and construed*." *Id.* (emphasis added) (quoting *Carson Pirie Scott & Co. v. Parrett*, 346 Ill. 252, 178 N.E. 498 (1931)). Nothing in *Doe* suggests that the court intended to overrule this prior precedent. Indeed, *Doe* cites *OEC-Diasonics, Inc.*, 674 N.E.2d at 1315, for its statement about the parties "mak[ing] it explicit in the contract," and *OEC-Diasonics, Inc.* quotes the above language from *Freigy*, so it is clear the cases are all applying the same standard.

[5] Defendants suggest it is significant that the Rush–CCNI Agreement does not specifically name Plaintiff. But a third–party beneficiary may be unnamed in the contract. *Freigy*, 223 Ind. at 348, 60 N.E.2d at 290 ("appellant is within the class of those whose real property might be injured by an act or deed of the contractor or his subordinates in carrying out the contract, and, *though unnamed therein*, may recover as a third party beneficiary if she can prove the causal connection" (emphasis added)); *Irwin's Bank v. Fletcher Sav. & Tr. Co.,* 195 Ind. 669, 145 N.E. 869, 876 (1924) ("It is not our purpose to hold that a contract may not be made for the benefit of a third person, although such person may not be specifically mentioned[.]"). Or a third–party beneficiary may be identified in the contract, as Plaintiff argues was done here, by a class to which he belongs. *Harvey v. Lowry*, 204 Ind. 93, 183 N.E. 309, 311 (1932) (third–party beneficiary may be shown where "the obligation runs to and is for the benefit of a designated third person *or class*" (emphasis added)); *see also Mogensen*, 441 N.E.2d at 35 ("a clear intent to directly benefit [a third party] … may be shown by naming a specific [person] or [a group of persons] as a class, or by other evidence demonstrating the intent or understanding of the parties" (internal citations omitted)).

14

[Plaintiff's] claim that his 'equipment' benefit created a contractual relationship" [DE 37 at 10]. But Defendants do not explain why that is the case. Instead, they assert, also without explanation, that "if such 'equipment or staffing' was not provided, only Rush would have been able to sue to enforce such a promise—not Dr. Kass–Hout." [*Id.*; *see also* DE 42 at 3 (asserting that Physicians were not third–party beneficiaries because the provisions cited above were enforceable only by Rush)]. Defendants do not cite any provision in the agreement that states Physicians cannot enforce any provision of the agreement; thus, Defendants' conclusory assertion that the contracting parties' intent was to not allow such a suit appears to be the result of circular reasoning, i.e., Physicians have no right to enforce the contractual provisions at issue because they are not third–party beneficiaries, and Physicians are not third–party beneficiaries because they do not have the right to enforce the agreement's contractual provisions.

In any event, Defendants ignore other provisions in the agreement that provide direct benefits to Physicians. For instance, CCNI promised that:

- "[Rush] and each Physician are to be covered as additional insureds on CCNI's general liability insurance policy on a primary and non–contributory basis with respect to liability arising out of non–professional work or operations performed by or on behalf of CCNI." [DE 37-1 ¶ 4.1].

- CCNI would "grant[ ] [Rush] and each Physician a waiver of any right to subrogation that its general liability insurer may acquire against [Rush] or any Physician by virtue of the payment of any loss under such insurance." [*Id.*].

CCNI also promised the following with respect to Physicians who performed services under the agreement:

CCNI shall neither have nor exercise direction or control over the methods, techniques or procedures by which the Physicians perform their professional responsibilities hereunder. CCNI's sole interest

15

and responsibility is to ensure that the Services are performed in a professional, competent, efficient and timely manner.

[*Id.,* Article VII]. Similarly, *both* CCNI *and* Rush:

acknowledge[d] and agree[d] that neither … [would] have or exercise any control or direction over the specific methods by which Physicians provide professional services and practice medicine, including the Services. Nothing contained in this Agreement requires referrals to health care facilities, interferes with patients' choice for medical treatment, or interferes with said Physician's independent medical judgment.

[*Id.*, ¶ 2.5].

Defendants point out that the intent required to confer third–party beneficiary status "is *not* a desire or purpose to confer a particular benefit upon the third–party nor a desire to advance his interest or promote his welfare, but an intent that the promising party or parties shall assume a direct obligation to him." [DE 42 at 3 (quoting *M Jewell, LLC v. Bainbridge*, 113 N.E.3d 685, 689 (Ind. Ct. App. 2018) (emphasis added))]. Defendants argue that the provisions cited above conferred only an indirect benefit on Plaintiff. But Defendants do not explain why the benefits to Physicians accorded by the cited provisions are indirect rather than direct. Instead, Defendants' reasoning appears to be that the agreement confers only an indirect benefit on Plaintiff because Plaintiff is not a third–party beneficiary, which, again, is circular. Another possibility is that Defendants are confusing the word "direct" with the word "primary." As the Seventh Circuit has explained, "[t]he primary purpose of most contracts is to benefit the signatories. If the parties intend to benefit a third party as well, there is no reason we can think of … to thwart their intention by reference to the hierarchy of their intentions." *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 220 (7th Cir. 1996). The court continued: "Granted, the fact that a third party would be benefited by performance of the contract is not enough to give him the status of a third party beneficiary. … But this is different from insisting that an *intended* third party beneficiary—as distinct from an

16

incidental, that is, an unintended, beneficiary—be the *primary* intended beneficiary of the contract." *Id.* (emphasis in original).

A finding that the benefits conferred on Physicians by the agreement are direct rather than indirect, therefore, is not precluded by the conclusion that Rush is the primary beneficiary of the agreement. A direct benefit would be a benefit without intervening factors or intermediaries. Thus, the Court looks to the manner in which the cited provisions affect or impact Physicians who provide services under the agreement. The cited provisions relate first and foremost to matters that are essential for Physicians to provide medical services at Defendants' facilities. Defendants assert without support that these provisions directly benefit Rush, not Physicians. But that assertion is contrary to common sense. The previously cited equipment provision (¶ 3.2) directly affects the Physicians' ability to provide the medical services they are called upon by the agreement to provide. If anything, equipment requirements only indirectly affect Rush, by affecting how the Physicians provide services on Rush's behalf. Moreover, the requirements in paragraph 4.1 impose separate insurance requirements for Rush *and* the Physicians; to interpret them as directly benefitting *only* Rush makes no sense. Finally, paragraph 2.5 expressly imposes a contractual obligation on *both* Rush *and* CCNI, i.e., Physicians are the direct and *only* beneficiaries of that provision.

In short, the Physicians could not provide the medical services called for under the agreement without jeopardizing the health and welfare of their patients but for the promises CCNI made in the agreement quoted above. Indeed, as mentioned before, any benefit accruing to Rush from these provisions was mostly indirect, because the Physicians, not Rush, were the ones providing medical care to the patients at Defendants' facilities. *See, e.g., Kirtley*, 562 N.E.2d at 38 ("[I]t is apparent that [developer's successor] not only intended to benefit [homeowner's

association], it intended to impose an obligation in favor of [homeowner's association]. Indeed, any benefit accruing to [developer's successor] was indirect at best because … [developer's successor] intended and did delegate [responsibility for the matter at issue] to [the homeowner's association].").

The only provision other than the one relating to assignments that Defendants cite to argue that the contracting parties did not intend to accord Physicians third–party rights under the agreement is paragraph 2.4, which provides that "[c]omplaints regarding Services rendered by Physicians shall be handled in accordance with all written CH Medical Staff policies and applicable CCNI policies in effect from time to time, and this Agreement." [DE 37-1 ¶ 2.4]. Defendants assert that this provision "allows for any physician (including Dr. Kass–Hout) to be removed *without* triggering termination of the Rush Agreement." [DE 37 at 9 (emphasis in original)]. But Defendants explain neither how the language supports that conclusion nor how such a provision negates the direct benefits that the above–cited provisions appear to accord Physicians so long as they are not removed from their position.

The Court notes that none of the Indiana third–party beneficiary cases cited by the parties involve a physician suing a hospital. The Court has found one case outside Indiana, however, where the court held that allegations of a physician employed by an entity other than the hospital stated sufficient facts on a motion to dismiss to support a claim for third-party beneficiary status under a contract between the hospital and the physician's employer. *See Perry v. Baptist Health*, 358 Ark. 238, 189 S.W.3d 54 (2004). In another out–of–state case, the court found no third–party beneficiary status, but significantly the case involved the assertion by physicians of the economic benefits of the contract between the medical group and hospital, for which the physicians could assert only an indirect benefit. *See Tredrea v. Anesthesia & Analgesia, P.C.*, 584 N.W.2d 276

18

(Iowa 1998). Unlike in that case, the beneficial provisions on which Plaintiff relies for third–party beneficiary status as previously discussed only indirectly affect Rush through their direct impact on Plaintiff's ability to provide medical services to patients.[6]

Finally, dismissal of Count III on the ground that Plaintiff is not a third-party beneficiary of the Rush–CCNI Agreement would be premature in any event, as that issue "would be more appropriately decided on summary judgment." *Lake Cent. Sch. Corp. v. Jacob & Maciejewski, A.I.A. & Assocs., Architects P.C.*, No. 2:10-CV-97, 2011 WL 3159834, at *2 (N.D. Ind. July 26, 2011) (quoting *Luhnow*, 760 N.E.2d at 627 ("Whether or not one is a third-party beneficiary is a

---

[6] In the only Indiana case the Court could find involving a physician–hospital relationship, the court upheld on summary judgment a physician's assertion of a § 1981 claim against the hospital by finding that an actual contractual relationship between the parties could be inferred from the facts relating to "the entire *relationship* between [the physician] and the Hospital," including but not limited to the hospital bylaws to which the physician agreed but which, in and of themselves, did not create a contractual relationship. *Hamdan v. Ind. Univ. Health N., LLC,* No. 1:13-cv-195-WTL-MJD, 2014 WL 5782248, at *9-11 (S.D. Ind. Nov. 5, 2014) (emphasis in original) (citing, inter alia, *Wortham v. Am. Family Ins. Grp.*, 385 F.3d 1139, 1141 (8th Cir. 2004) ("Section 1981 does not limit itself, or even refer to employment contracts but embraces all contracts and therefore includes contracts by which a[n] … independent contractor … provides service to another.") (internal quotation marks and citation omitted)). The question of whether a direct contractual relationship between a physician and a hospital can be said to exist has led to diverging views among courts. *Compare Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304 (11th Cir. 2010) (affirming district court's dismissal of a physician's § 1981 claim and rejecting the physician's argument that he had an implicit contract with hospital pursuant to the hospital's agreement to grant the plaintiff medical staff privileges and the plaintiff's agreement in return to treat patients at the hospital); *Adem v. Jefferson Mem'l Hosp. Ass'n*, No. 4:11-cv-2102, 2012 WL 5493856 (E.D. Mo. Nov. 13, 2012) (same result as *Jimenez* on the ground that the plain language of the hospital's bylaws, and under Missouri law, medical staff bylaws do not constitute a contract between doctors and hospitals), *with Ennix v. Stanten*, 556 F. Supp. 2d 1073, 1082-84 (N.D. Cal. Apr. 28, 2008) (holding that a cardiac surgeon who sued the hospital for racial discrimination could assert a § 1981 claim because a jury could find that an employment contract had been formed based on the hospital's granting of medical privileges to the doctor in return for which the doctor agreed to comply with the hospital's bylaws, rules, and regulations). Since Plaintiff has not argued he has a direct contractual relationship with CCNI or The Community Hospital, the Court will not consider this theory for the impaired contract under which Plaintiff seeks to assert a § 1981 claim for purposes of this motion.

fact question dealing with the intent of the contracting parties, and a judgment on the pleadings is not the proper vehicle for making that determination.")); *see also Best Flooring, Inc. v. BMO Harris Bank, N.A.,* No. 1:12-cv-5-WTL-TAB, 2013 WL 164237, at *4 (S.D. Ind. Jan. 15, 2013) (where the plaintiff pointed to a letter and several other facts in arguing it was an intended third–party beneficiary, court held "[t]his is sufficient to satisfy the notice pleading standard with regard to this issue, as it raises the possibility that [the plaintiff] was an intended beneficiary beyond the speculative level"); *Whaumbush v. City of Philadelphia*, 747 F. Supp. 2d 505, 520 (E.D. Pa. 2010) (plaintiff's allegation that he was intended beneficiary of the contract "provided a sufficient legal basis for his § 1981 claim to move forward, with the presumption that discovery will aid the Court in making a future standing determination").

### 2.   WHETHER PLAINTIFF'S DAMAGES ARISE FROM A BREACH OF THE RUSH–CCNI AGREEMENT

Defendants also argue that Plaintiff's alleged damages arise from an entirely separate contractual relationship, which is his employment contract with Rush, and that, "[b]ecause he has not and cannot establish his injury arose from" any alleged breach by Defendants of the Rush–CCNI Agreement, Plaintiff's § 1981 claim "warrants dismissal." [DE 37 at 12]. Defendants' causation argument at this stage of the proceedings is not well taken. Plaintiff need only plead that, "but for race, [he] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020). The Court finds that Plaintiff has adequately met that pleading standard here.

Plaintiff asserts a loss of his contractual rights as a third–party beneficiary under the Rush–CCNI Agreement. It is undisputed that agreement was terminated, and therefore Plaintiff suffered the asserted loss. Defendants argue that loss was not caused by any breach of the terms of the

Rush–CCNI Agreement. But § 1981 "provides a remedy for intentional discrimination that produces contractual impairment whether or not the defendant breaches a contract in the process." *Sambasivan v. KIadlec Med. Ctr.*, 184 Wash. App. 567, 585, 338 P.3d 860, 869 (2014) (citing cases). If, but for Plaintiff's race, CCNI would not have terminated the agreement, then, according to Plaintiff's allegations, Plaintiff would not have suffered the loss in question.

The Seventh Circuit has said that a plaintiff:

> is not obligated … to plead facts that bear on the statutory elements of a claim. Instead, the Federal Rules of Civil Procedure require[ ] plaintiffs to plead *claims* rather than facts corresponding to the elements of a legal theory. It is therefore manifestly inappropriate for a district court to demand that complaints contain all legal elements (or factors) plus facts corresponding to each. It is enough to plead a plausible claim, after which a plaintiff receives the benefit of imagination, so long as the hypotheses are consistent with the complaint.

*Rowlands v. United Parcel Serv.–Fort Wayne,* 901 F.3d 792, 800 (7th Cir. 2018) (internal quotation marks and citations omitted) (emphasis added by court). Further articulation and proof of Defendants' discriminatory conduct and how it led to Plaintiff's damages is not required at this stage of the proceedings.

### B.   PLAINTIFF'S EMPLOYMENT AGREEMENT WITH RUSH

Plaintiff also argues that he has stated a § 1981 claim based on Defendants' discriminatory interference with Plaintiff's employment contract with Rush. "[D]iscriminatory interference with a third-party contract" is actionable. *Perry v. Naples HMA, LLC.*, No. 2:13-cv-36, 2014 WL 6610125, at *8 (M.D. Fla. Nov. 19, 2014) (citing cases), *rev'd in part on other grounds*, 809 F. App'x 574 (11th Cir. 2020). As the Seventh Circuit explained:

> [Section 1981] gives nonwhites the same right to make and enforce contracts as whites have. For the Ku Klux Klan to beat up nonwhites who try to enforce their contracts violates the statute even though

> the Klan is not a party to the contracts. That is to say that tortious interference with contract rights violates section 1981 when the motivation for the interference is racial.

*Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008) (internal citations omitted).

Under this theory of Plaintiff's § 1981 claim, the lack of an employment relationship between Plaintiff and Defendants, or the lack of third-party rights under the Rush–CCNI Agreement, does not preclude Plaintiff from prevailing on a § 1981 claim. Instead, Defendants "can be liable under § 1981 for *interfering* with [Plaintiff's] relationship with his employer [Rush]," *Sklyarsky v. Means-Knaus Ptnrs.*, *L.P.,* 777 F.3d 892, 896 (7th Cir. 2015) (emphasis in original), even though Plaintiff himself has no direct contractual relationship with Defendants. *See, e.g., Thomas v. Coach Outlet Store*, No. 16 C 3950, 2017 WL 386656, at *2 (N.D. Ill. Jan. 27, 2017) (finding a plausible § 1981 interference claim where the plaintiff alleged the defendants interfered with her employment relationship with a third party by terminating her assignment to work at the defendants' store and making false reports about her to her employer); *Taite v. Ala., Dep't of Pers.*, No. 2:11CV739-MHT, 2012 WL 3631619, at *7 (M.D. Ala. July 16, 2012) (finding that the plaintiff's allegations that the General Counsel for the State Personnel Board "interfer[red] with her existing employment relationship with Dartmouth College" stated a valid § 1981 third-party interference claim), *report and recommendation adopted*, No. 2:11CV739-MHT, 2012 WL 3629216 (M.D. Ala. Aug. 23, 2012).

Applying this legal theory to facts similar to those here, the court in *Perry v. Naples* held that a physician stated a § 1981 interference claim against a hospital based on allegations of the hospital's racial discrimination, which led to the termination of the physician's contract with a third–party provider pursuant to which the physician had served as the medical director of the hospital's emergency department. 2014 WL 6610125*, at *8-9. Similarly, in *Moore v. Grady*

*Memorial Hospital Corp.*, 834 F.3d 1168 (11th Cir. 2016), the Eleventh Circuit held that § 1981 provided a remedy against a hospital for a physician who has a contract with a third party if that contract is impaired as a result of the suspension, revocation, or adjustment of his privileges at the hospital, as long as the physician sufficiently alleged that the cause of that impairment was racial animus. *Id.* at 1171-74.[7]

Defendants argue that this theory of recovery is precluded by *Domino's Pizza*. [DE 42 at 7]. The district court in *Perry v. Naples* rejected a similar argument with reasoning equally applicable here:

> In its defense, [Hospital] relies on *Domino's Pizza* … for the proposition that contractual privity is required to bring a cause of action under § 1981. [Hospital] misreads *Domino's*, which is inapplicable to the facts of this case. The lesson of *Domino's* is that "[a]ny claim brought under § 1981 ... must initially identify an impaired 'contractual relationship,' under which the plaintiff has rights." 546 U.S. at 476 (internal citation omitted). [Physician] has identified such a contractual relationship: her Physician Agreement and Medical Director Agreement with [Third–Party]. *Domino's* protects [Hospital] from an argument that [Physician] is not making. If [Physician's] § 1981 claim attacked the contract between [Hospital] and [Third–Party], *Domino's* might preclude the claim because this Court has already determined that [Physician] did not have any rights under that contract.[8] ... However, [Physician] alleges that [Hospital] has interfered with her contract with [Third–Party] for discriminatory reasons. Where the plaintiff possesses contractual rights of the sort [Physician] has here, *Domino's* is no bar.

---

[7] *But see Perry v. VHS San Antonio Ptnrs., LLC*, 990 F.3d 918, 931-33 (5th Cir. 2021) (holding that the physician plaintiff did not have a claim under § 1981 against the hospital for interference with his employment contract with a medical group that terminated the contract at the hospital's request).

[8] This portion of *Perry v. Naples* is distinguishable because here, as previously discussed, the Court finds that third-party beneficiary rights under the Rush-CCNI agreement are not precluded at this stage of the proceedings.

23

2014 WL 6610125, at *9.

Defendants also make a separate argument based on a footnote in *Domino's Pizza*, in which the Supreme Court rejected the plaintiff's attempt to rely for his § 1981 claim on his own contracts with the corporate entity he owned (as opposed to the contract between the corporate entity and the defendants). *See* 546 U.S. at 480 n. 4. Defendants quote the Supreme Court's statement that the corporate entity "did not breach any contractual obligation to [the plaintiff], … and so any injury he may have received still derived from impairment of the contractual relationship between [the corporation] and [the defendant], under which [the plaintiff] has no rights." *Id.* Defendants argue "[t]he same is true here, where [Plaintiff] has not brought any underlying claims against Rush, and an asserted § 1981 injury, if any, 'still derives' from alleged impairment of the Rush Agreement, 'under which [Plaintiff] has no rights.'" [DE 42 at 7-8].

The analogy is inaccurate. The injury for which the plaintiff in *Domino's* sought to recover was not an injury to his contract rights with the corporate entity, but a derivative injury based on the injury to the corporate entity, which he owned. In that sense, the plaintiff's argument based on his rights under contracts with the corporate entity was said to be merely a "formulatio[n] of," *Domino's Pizza*, 546 U.S. at 480 n.4, the already rejected argument that the plaintiff could recover under § 1981 based on the impaired contractual rights of the corporate entity. *See id.* at 477 (applying basic principles of corporation and agency law "that the shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation's contracts"). Here, Plaintiff alleges an impairment of his employment contract with Rush. Unlike the injury discussed in the *Domino's Pizza* footnote, Plaintiff's alleged injury to his employment contract with Rush is not derivative of an injury to Rush. It is a direct injury to Plaintiff's contractual rights with Rush. Plaintiff alleges that impairment was the result of Defendants'

racially motivated interference, not a breach of contract by Rush. An impairment to a contract that is not also a breach of contract may still be actionable under § 1981. *See Sambasivan*, 184 Wash. App. at 584, 338 P.3d at 869 (rejecting argument that, "if a defendant's intentionally discriminatory action against a plaintiff is not *itself* a breach of contract, then any other contract rights or opportunities that it impairs are not actionable under § 1981" (emphasis in original)). Plaintiff has adequately alleged these elements here. *See, e.g., Thanongsinh v. Bd. of Educ.,* 462 F.3d 762, 783 (7th Cir. 2006) (where plaintiff's demotion constituted interference with his employment contract, court finds adequate causal connection alleged based on discriminatory scoring of test leading to the plaintiff failing the test leading to the plaintiff's demotion).

Finally, Defendants argue that Plaintiff's interference theory fails because Defendants lacked the requisite authority to direct or interfere with Rush's exercise of its rights under Plaintiff's employment contract. [DE 42 at 8 n.8]. The cases cited by Defendants on this point, however, deal with interference with a prospective contractual relationship. Here, Plaintiff alleges interference with an existing contractual relationship. That is, Plaintiff alleges that Defendants cancelled the Rush–CCNI Agreement for discriminatory reasons, i.e., to allow Defendants to replace Plaintiff with another physician who was not Syrian Arab [DE 31 ¶¶ 35-38, 70-72], and that the termination of the Rush–CCNI Agreement was the reason why Rush amended its employment contract with Plaintiff to reduce Plaintiff's salary, responsibilities, and position [*id.* ¶¶ 73-74]. "[T]o prevail on a claim of discriminatory interference with a third–party contract under § 1981, the plaintiff must demonstrate a causal link between the alleged interference and the resulting loss of a specific contract interest." *Perry*, 2014 WL 6610125, *10 n.4. Unlike in a situation involving a prospective contractual relationship that the plaintiff hoped to enter, Plaintiff's allegation that the harm he suffered to his existing contractual relationship with Rush

was caused by Defendants' discriminatory conduct is not speculative. And while Defendants may have lacked authority to direct Rush to take any action regarding Plaintiff's employment contract with Rush, Defendants do not dispute that they had the authority to, and did in fact, terminate the Rush–CCNI Agreement. Plaintiff's theory of interference based on Defendants' exercise of that authority may be actionable "if discriminatory intent and the required harm can be proved." *Sambasivan*, 184 Wash. App. at 587, 339 P.3d at 870; *see, e.g., Moore,* 834 F.3d at 1174 (allegations were sufficient under Rule 12(b)(6) to show impairment of physician's existing employment contract with medical school where employment contract required physician to obtain surgical privileges at nearby hospital and, although employment contract was never terminated, plaintiff alleged it was impaired by the hospital's intentionally discriminatory acts of summarily suspending physician's privileges, diverting cases to white physicians outside of the hospital system, and failing to provide operating rooms for surgery to the African–American doctors from the medical school).

Defendants did not present a developed argument on the interference argument, so the Court will not address it in any further detail at this time,[9] particularly given that it is a new argument in a reply brief and Plaintiff has not yet had the opportunity to respond to it. Defendants may raise the issue in a later filed summary judgment motion if they wish. For present purposes, the Court finds that the factual allegations of Defendants' termination of the Rush–CCNI Agreement (which is alleged to have been motivated by discrimination), and a loss under Plaintiff's contract with Rush, establish a causal link sufficient to withstand a motion to dismiss.

---

[9] *See Riley v. City of Kokomo, Ind. Hous. Auth.,* 909 F.3d 182, 190 (7th Cir. 2018) ("[i]t is not the obligation of th[e] court to research and construct the legal arguments open to parties").

**CONCLUSION**

Based on the foregoing, the Court **DENIES** Defendants' Motion to Dismiss Plaintiff's Section 1981 Claim Of Amended Complaint [**DE 36**].

So ORDERED this 2nd day of September, 2022.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT